OPINION OF THE COURT
James C. Tormey, J.
By way of background, on August 13, 2015 this court found that the respondent, Richard Z., was not presently receiving “meaningful treatment” while at the Central New York Psychiatric Center (hereinafter referred to as CNYPC). The court further found that Richard Z.’s expert, Dr. Kostavdakis, provided credible testimony, and part of that testimony was that, if the court placed Richard Z. on strict and intensive supervision and treatment (hereinafter referred to as SIST) pursuant to Mental Hygiene Law, article 10, § 10.01 (c), Richard Z. would need access to appropriate treatment to address his individual needs, which may include chemical therapy. Dr. Kostavdakis recommended various conditions for a release on SIST, as discussed further in this order. As part of the conditions, Dr. Kostavdakis urged the court to consider the possibility of medication to help Richard Z. manage his sexual urges. According to Dr. Kostavda-kis, part of that monitoring would be to track Richard Z.’s response and potential side effects to medication. Additionally, Dr. Kostavdakis recommended (1) GPS monitoring, (2) in-person reporting, (3) random/supervised urine analysis screens, (4) ongoing involvement in structured cognitive behavioral treatment for sexual offenders, once weekly, with monthly reports sent to the Department of Parole, (5) limited and/or supervised contact with family, and (6) limited and supervised contact with females, along with the other 85 or so standard conditions of SIST release.
Since 2011, and during the course of this case, Richard Z. has requested chemical therapy, which would substantially reduce his sexual urges, and has proved in scientific tests[1] to assist in the reduction of recidivism to less than 3%. He has, however, been denied such treatment by the Office of Mental Health because of alleged potential side effects concerning bone density and a perceived lack of “informed consent.”
*1068 After taking testimony, this court appointed the world-renowned expert, Dr. John Bradford,[2] to render expert advice to the court for a program of “meaningful treatment” for Richard Z. as a condition of SIST. Dr. Bradford then provided an evaluation report to this court after a review of Richard Z.’s history and medical records, and a five-hour personal interview with Richard Z., which this court believes was appropriate and necessary in order to diagnose and treat Richard Z. In doing so, Dr. Bradford has made various recommendations to this court for treatment, indicating that the treatment he has recommended “would likely place Richard Z. at a low risk for future sexual offense recidivism and violent recidivism to the point that he could be released to the community on strict supervision.” This recommendation includes a regimen of chemical therapy, specifically Lupron Acetate.
Dr. Bradford has rendered expert advice to the court for a program of meaningful treatment of Richard Z. as a condition of SIST. Dr. Bradford indicated that Richard Z., by virtue of age, has a reduced risk of sexual offense recidivism. He has completed programs for sexual offenders in a correctional facility as well as the CNYPC. From a diagnostic standpoint, utilizing the World Federation of Societies of Biological Psychiatry Guidelines, it is Dr. Bradford’s opinion that Richard Z. should be treated as part of a prerelease program with a luteinizing hormone-releasing hormone agonist, specifically Lupron (Leu-prolide Acetate). Dr. Bradford indicated that Richard Z. has agreed to engage in antiandrogen treatment. He explained the use of that treatment to Richard Z. and how it would result in pharmacological castration, and the potential side effects which are treatable. Dr. Bradford recommended that this, in addition to strict conditions of supervision, would most likely place Richard Z. as a low risk for future sexual offense recidivism and violent recidivism to the point that he could be released on strict community supervision. Dr. Bradford was clear that Richard Z.’s release should be conditioned on treatment with a luteinizing hormone-releasing hormone agonist, specifically *1069 Lupron, in doses recommended by his report. Dr. Bradford also indicated that the release on SIST should include the usual requirements of restricted community living, including curfew, refraining from the abuse of alcohol and non-prescription drugs, and any other supervision requirements the court sees fit, including GPS monitoring.
Based upon the testimony and the reports of both expert doctors in this case, Dr. Kostavdakis and Dr. Bradford, it is clear to this court that meaningful treatment includes treatment with medication (chemical therapy) in order to facilitate the safe release of the respondent, Richard Z., on SIST pursuant to Mental Hygiene Law, article 10, § 10.01 (c). It is clear that meaningful treatment for SIST would include medication, as set forth in Dr. Bradford’s report, in the form of Lupron, and that Richard Z. should be entitled to receive that medication if he chooses to do so, and be released on SIST.
The court’s position has not changed nor has it altered since the beginning of this process under Mental Hygiene Law article 10. If treatment is available for these individuals that can help the individuals become safe in the community and productive outside of the psychiatric institution, then that medication should be made available to the individuals for release. This is consistent with the clear legislative intent and the plain reading of Mental Hygiene Law, article 10, § 10.01 (a), (c) which provide “offenders [shall] have access to proper treatment” including “an integrated approach that is based on evolving scientific understanding, flexible enough . . . and sufficient to provide meaningful treatment,” and which, in Richard Z.’s case, is consistent with the recommendations of the sex offender experts, Dr. Bradford and Dr. Kostavdakis, in regard to the use of chemical therapy treatment for Richard Z.
This court ordered all parties to appear, in order to formulate a release under SIST, which will include terms and conditions that Richard Z. can understand, acknowledge and give an informed allocution prior to his release under SIST; the conditions shall include medication necessary in order to assist him in treatment for his mental abnormality on a SIST program as recommended by the two experts in this case. The parties appeared on December 8, 2016. On that date, this court was under the belief, through Office of Mental Health records and reports received from the New York State Attorney General’s Office, and provided to counsel for Richard Z., that Richard Z. was being presented to formulate a release under SIST. This *1070 would include an acknowledgment by Richard Z. that he understood and agreed to his release under strict and intensive supervision and treatment under the conditions, which would include his treatment with an antiandrogen medication, namely Depot Lupron, which is necessary to assist him in treatment for his mental abnormality under a SIST program, and would render him “safe” to be released into the community.
According to exhibits that were previously presented to the court, the issue surrounding the ability of Richard Z. to be prescribed Lupron, the expert-recommended antiandrogen drug to assist Richard Z. in controlling his sexual urges, centers around the effect that the drug may have on his bone density. The Central New York Psychiatric Center treatment providers received a full medical report regarding Richard Z.’s bone density, and the medical providers convened to discuss the results. It was determined by the medical team that Richard Z. would be able to physically tolerate Lupron therapy with some added medications to slow any associated bone loss. The evidence further indicated that this determination would be discussed with Richard Z., and he would need to communicate his “informed consent” as to whether or not he is agreeable to begin Lupron therapy. Four days after the medical team discussed the matter on November 17, 2016, Dr. Elisabeth Gray, who was newly assigned to this case as a psychiatrist for Richard Z., conducted an interview. Richard Z. has been in civil confinement at CNYPC for nine years and one month as of this court date, and was confined for 30 years prior to that time in prison. It was clearly represented to this court that Richard Z. had been asking CNYPC to consider him since 2011 for Lupron treatments. Lupron is an off-label prescription utilized as an antiandrogen in treating sex offenders, and has been regularly testified to by experts to successfully assist sex offenders who are released into the community. In fact, CNYPC has utilized Lupron on several of their sex offender patients for these medical purposes without court orders.
“Informed Consent” v. Motivation
On November 22, 2016 at 1:00 p.m., Dr. Elisabeth Gray, along with others, scheduled an “informed consent” conference relative to the treatment of Richard Z. utilizing Depot Lupron and alendronate. Dr. Gray testified that she had recently been reassigned to take over the sex offender treatment program three or four days prior to the informed consent conference. Dr. Gray further testified that she does not have a background in sex of *1071 fender treatment programs. The “informed consent” conference lasted approximately 30 minutes.
The process of informed consent occurs when communication between a patient and physician results in a decision by the patient to either undergo or not undergo a specific medical intervention (see AMA Code of Med Ethics, Ops on Prac Matters 2.1.1 [Informed Consent]; Public Health Law § 2805-d). Patients have a right to receive information and ask questions about recommended treatments so that they can make well-considered decisions about care (see AMA Code of Med Ethics, Ops on Prac Matters 2.1.1 [Informed Consent]; Public Health Law § 2805-d).
While Dr. Gray testified that “as a physician, I have sworn to do no harm,” the practice of medicine, and its embodiment in the clinical encounter between a patient and a physician, is fundamentally a moral activity that arises from the imperative to care for patients and to alleviate suffering (AMA Code of Med Ethics, Ops on Prac Matters 1.1.1 [Patient-Physician Relationships]). The relationship between a patient and a physician is based on trust, which gives rise to a physician’s ethical responsibility to place a patient’s welfare above the physician’s own self-interest (id.). A patient-physician relationship exists when a physician serves a patient’s medical needs (id.). Physicians are expected to uphold the ethical norms of their professions, including fidelity to patients and respect for patient self-determination (AMA Code of Med Ethics, Ops on Prac Matters 1.1.7 [Physician Exercise of Conscience]).
While a physician may act or refrain from acting in accordance with the dictates of their own conscience, that freedom is not unlimited (AMA Code of Med Ethics, Ops on Prac Matters 1.1.7 [Physician Exercise of Conscience]). In fact, a physician may have stronger obligations to a patient who is not reasonably able to access medical treatment from another qualified physician (id.). Such is the case with Richard Z., who is unable to obtain an independent doctor from the outside to write a prescription, and/or unable to receive a second opinion from a qualified doctor within this institution. Pursuant to the American Medical Association Code of Medical Ethics, Opinions on Practice Matters 1.1.7 (f), physicians should refer a patient to another physician or institution to provide treatment that the physician declines to offer. Such a referral was not made with regard to Richard Z.
In reviewing the testimony of Dr. Gray, while she does indicate that Richard Z. stated that “the Judge said I have to *1072 take it” and that “he would not have chosen to take this medication by himself” and “that he knew he had other choices,” it is abundantly clear to this court that such responses appear to be coaxed from Richard Z. through a carefully guided inquiry by Dr. Gray in dissuading Richard Z. from accepting the treatment. It is clear to this court that Dr. Gray was acting according to her own subjective views and beliefs thereby substituting those views and opinions for Richard Z.’s. Pursuant to the American Medical Association Code of Medical Ethics, especially in light of Richard Z.’s limited access to consultation with another qualified physician, he should have been afforded an opportunity to obtain a second opinion to address his concerns. While Dr. Gray testified that “[I] have no objection if someone else would prefer to prescribe it. [I] wouldn’t stop them,” it is clear to this court that no efforts were made to facilitate a referral as required under the American Medical Association Code of Medical Ethics.
It is clear to this court that Richard Z. is one of the more intelligent, educated and engaged respondents, who clearly understands the off-label use of this prescription and its risk. In the opinion of this court, Richard Z. is the most informed and knowledgeable respondent that this court has reviewed for civil confinement under Mental Hygiene Law article 10 over the past nine years.
Prior to taking the testimony of Dr. Gray, the court acknowledged that Richard Z.’s attorney would have a right, after she heard all of the testimony presented, to keep the case open and bring other individuals forward to testify if she felt it necessary. At the end of the testimony, the court granted the parties the right to present witnesses by notice to the court no later than February 17, 2017. Richard Z.’s attorney notified the court on February 17, 2017 that she would not bring any additional witnesses and the Attorney General’s Office did not request to bring any additional witnesses.
After being sworn in, Dr. Gray testified that a week and a half prior to this hearing, she was transferred by CNYPC to take over the sex offender treatment program in that unit. When queried as to whether or not she had a background in sex offender treatment programs, she indicated that she did not. Dr. Gray testified that she was asked three to four days prior to meeting with Richard Z. if she would conduct an “informed consent” procedure for Richard Z., which would result in initiating treatment with Depot Lupron. Dr. Gray fur *1073 ther stated that she was aware that Depot Lupron was used as an antiandrogen therapy, off-label, to treat sexual offenders. Dr. Gray testified that once she was assigned to Richard Z.’s case, she attempted to refresh her knowledge of the medication because it was “shallow.” She indicated that she looked up policies and procedures at the institution so that she was informed on what she needed in order to perform this “informed consent” procedure. She stated that under her title “Psychiatric 1,” it would be her responsibility to prescribe medication, such as Depot Lupron, to any resident. On November 22, 2016 at approximately 1:00 p.m., Dr. Gray met with Richard Z. for approximately 30 minutes. She stated that also present were Dr. Forshee, Richard Z.’s team leader, Mrs. Linda Sirano, his nurse practitioner handling all of his medical issues, and Ms. Candy Wilbur, along with a secure care treatment aid therapy assistant.
Dr. Gray testified that Richard Z. understood the purpose of the meeting, and was agreeable with the procedure. She indicated that the group handed Richard Z. an informed consent form for Depot Lupron and alendronate that covers the risks, benefits and alternatives to the medications. Richard Z. was given time to read the sheet, and was asked in several different ways whether or not he had any other concerns or questions. He indicated that he had no concerns or questions. According to Dr. Gray, Richard Z. stated that he knew he would not be released into the community unless he accepted the medication, and he also stated that his attorney had advised him to accept the medication. Richard Z. indicated his concern had to do with his bone density issue, at which time Dr. Gray testified that Richard Z.’s medical specialist reviewed his medical results with him, and advised him of what treatment he would have to receive to keep from developing full osteoporosis. According to Dr. Gray, they also discussed with Richard Z. that this trans-androgen therapy may have to be discontinued if Richard Z. had complications. Richard Z. endorsed the treatment form, and Dr. Gray and the treatment leader, Ms. Sirano, then signed the form as witnesses.
Dr. Gray then testified that part of her concern for Richard Z. was his bone density issue, but that after speaking with Dr. Joseph Colosi she learned there are ways to correct a bone density issue if it arose. Dr. Gray testified that it is “medically unethical to give a medication to a patient who does not voluntarily consent when they are not under an order for treatment *1074 over objection.” Dr. Gray then stated that she had issues with Richard Z.’s voluntary consent, which the court believes, in accordance with AMA standards, is a consent made after having been given all of the necessary information and risks, and still agreeing to take the prescribed medication. Clearly, Dr. Gray began to look at the “motivation” for Richard Z. in making his “informed consent” in that decision. Dr. Gray substituted her subjective opinion for Richard Z.’s clear consent that he wanted to take the medication to get out of confinement because she did not agree with this motivation. Dr. Gray explicitly testified that the patient actively has the desire to take the Lupron medication. The subjective beliefs of a doctor regarding a patient’s right to choose are hardly the proper basis for a professional opinion. (AMA Code of Med Ethics, Ops on Prac Matters previously referred to above.)
It is the opinion of this court that Dr. Gray’s lack of experience and training in this area, along with her misinterpretation of her duties in this case, which was to address “informed consent” from Richard Z. to accept treatment with Depot Lu-pron, demonstrated this doctor’s and this institution’s attempt to avoid compliance with the clear and unequivocal expert opinions of Dr. Bradford and Dr. Kostavdakis. Both agree that chemical therapy for Richard Z. is an appropriate and necessary treatment for his safe release to the community. They reviewed eight years of treatment provided to Richard Z. by CNYPC, along with hours and hours of interviews with him. Dr. Gray’s lack of knowledge in treating sexual offenders was further confirmed when she testified that she was not familiar with Depot Lupron, and she relied on a review of her “micro-medex” database that did not indicate its off-label use to treat sexual behavior. After testifying that her concern was that the off-label use of this medication for sex offenders was not listed in the database, she then testified that she actually has re-prescribed Lupron to other sex offender patients at the CNYPC facility. Her testimony was conflicting and contradictory. She further testified that even though Richard Z. indicated that he wanted to take this drug, with one reason being that he wanted to be released on SIST, she inserted her view that he was really saying that he does not want to take Lupron, and the only reason he is choosing to take the drug is so he can “get out.” She stated that the risk of bone density issues to Richard Z. from taking Lupron was not acceptable, even though she indicated that she was not familiar with the effects of Lupron *1075 on bone density, and even though this possible side effect was addressed and could be treated with Fosamax, vitamin D, exercise, diet and absence of alcohol. Dr. Gray testified that she consulted with her colleague, Dr. Joseph Colosi, who is the medical director of the facility, and was much more knowledgeable than she was regarding this area. Dr. Colosi indicated to her that there were ways to treat the bone density issue. Dr. Gray stated that as she reviewed literature, she learned more about treating sex offenders; she testified that treatment can begin with SSRI drugs (serotonin, selective, reuptake inhibitors). She stated they are the Prozac, Zoloft and Zolex of this world. In the opinion of this court, Dr. Gray’s testimony continued to demonstrate her limited knowledge in the field of treating sex offenders.
Dr. Gray testified that she could not render an opinion regarding the consideration of safe release for Richard Z., since she was not asked by the Office of Mental Health to render an opinion for his release. To this court, another clear example of the lack of clinical review by Dr. Gray of Richard Z.’s treatment. Yet Dr. Gray tries to substitute her analysis to preclude the use of Lupron by Richard Z. in place of the opinions of the qualified experts, Dr. Bradford and Dr. Kostavdakis. Dr. Gray also testified that she looked at Richard Z.’s penile plethysmo-graph (PPG) tests, and they were invalid, but she would rather have Dr. Forshee further explain in detail as it is not her field. After deferring to Dr. Forshee, however, Dr. Gray did opine that the PPG tests led her to believe that if she used something that works on Richard Z.’s biology, like Lupron, it is not likely to be effective in changing his behaviors. When asked if she knew whether “Trazodone” is used for the treatment of sex offenders as an off-label drug to lower their sex offending behavior, Dr. Gray testified that she was not familiar with that medication. She did confirm that he was given 50 mg of traz-odone each morning. She admitted that she did not know whether the use of trazodone would provide an invalid PPG test. In the opinion of this court, this further strains her credibility to assess her interpretation of Richard Z.’s PPG tests. Dr. Forshee testified that using trazodone could have suppressed Richard Z.’s sexual urges and resulted in an invalid test. (Supra.)
When Dr. Gray was asked whether an independent doctor could come into the facility and prescribe this medication for Richard Z., Dr. Gray stated that outside doctors would not be *1076 credentialed in the facility to prescribe medication. This preclusion of outside doctors to prescribe medication would effectively prevent Richard Z. from being prescribed the medication that he should be entitled to for release on SIST. This is especially egregious when coupled with the fact that no second opinion was sought or provided by a qualified doctor within the institution.
The court then heard from Dr. Forshee, who is the Chief Psychologist and Director of Treatment Services at the CNYPC. She testified that a PPG was given in 2009, and in 2012, and that Richard Z. had a more recent PPG in 2016. According to the medical records, the 2009 test was invalid, the 2012 was valid, and the 2016 was invalid. Dr. Forshee testified that a PPG test is a measure to assess a person’s sexual arousal as a mechanical device that can measure the blood flow to the penis, and a respiration gauge that would go around the torso, along with a galvanic response gauge that is placed on the fingertips. These devices measure the blood flow to the penis, breathing and sweating in response to being presented with pictures of different people, men, women, and children, and their different sexual scenarios, which are presented auditorily. In Richard Z.’s case, an invalid test means that there were no valid representations of his arousal. Each test was completed by a different care provider.
The testimony from Dr. Forshee, who was present at the 2016 administration of the PPG test showed that Richard Z.’s responses did not meet the threshold for arousal. The intent in performing a PPG test prior to administering Lupron would be to get a baseline to measure against future PPGs after the medication is administered. Dr. Forshee further stated that the test was conducted in July 2016, as it is standard to complete a PPG test three months prior to the beginning of Lupron treatment. She further testified that after the invalid test, a second test was not given, even though there was plenty of time to complete one prior to November 2016 when it was believed that Richard Z. would begin his Lupron treatments.
Dr. Forshee further testified that Richard Z. had suppressed his sexual urges intentionally during the PPG test of 2016. This court queried whether Richard Z.’s sex offender training and use of trazodone could have caused an invalid test. Dr. Forshee stated that taking trazodone could have an effect on suppression, along with the nine years of in-patient treatment Richard Z. received, which is intended to teach him techniques *1077 on how to manage his sexual urges. Dr. Forshee stated that before taking a PPG test the recipients are instructed not to use any of those acquired techniques so that the doctors can see a clear picture of what is going on and whether or not they can obtain a valid baseline to determine the future progress of the patient.
The court then heard from Dr. Colosi, who is a medical physician and specialist at CNYPC. Dr. Colosi testified that he has reviewed the medical effects of Lupron which have been prescribed to the residents involved in the Mental Hygiene Law article 10 treatment process. Dr. Colosi testified that his reviews are to determine if the patient can medically tolerate the medication. Dr. Colosi’s review of Richard Z. found that there was no significant medical history, and he ordered a complete blood count chemistry, prostate specific antigen, and hormone values, along with a bone density review. Dr. Colosi testified that clearance was given to Richard Z. medically to be able to take the prescription Lupron. Dr. Colosi testified that in normal instances, osteopenia, which Richard Z. has, can be treated conservatively and moderated with vitamin D, exercise, diet and the absence of alcohol. Dr. Colosi recommended that Richard Z. be placed on Fosamax (an alendronate), and a higher dose of vitamin D, as well as calcium, because he would be receiving Lupron. Dr. Colosi stated that Lupron has an indirect effect on bone loss, as it increases the leuprolide hormone and follicle stimulating hormone to suppress the effect it has on the production of testosterone, as well as estrogen. Testosterone and estrogen both have bone-building effects. Dr. Colosi further testified that his medical opinion, consistent with that of the treatment team, was that Richard Z. could be placed on Lupron with consistent observation and medical evaluation of Richard Z.’s hormones.
Findings
After hearing testimony, this court finds that Dr. Gray, whether intentionally or unintentionally, inserted her medical opinions where she is clearly not an expert as to whether or not Lupron was an appropriate medication to provide to Richard Z. Richard Z. has been before this court for over nine years. This court has heard expert testimony from a renowned expert, Dr. John Bradford, Richard Z.’s evaluator, Dr. Kostavda-kis, and reviewed expert reports that indicate that Lupron is the appropriate and necessary medication in order to release Richard Z. on strict and intensive supervision and treatment, *1078 under the established conditions that would be included for a release to the community while on SIST. Mental Hygiene Law, article 10, § 10.01 (a) sets forth the responsibilities of the Office of Mental Health in the treatment of sex offenders, which includes “an integrated approach that is based on evolving scientific understanding, flexible enough to respond to current needs of individual [s] . . . , and sufficient to provide meaningful treatment.”
There have been many studies that show that antiandrogens greatly assist in repressing sexual urges and allow release of sex offenders safely into the community. Studies have shown that a less than 3% recidivism rate has occurred when sex offenders are provided chemical therapy and given continued psychological treatments. In this case, it has been opined by the world-renowned expert, Dr. John Bradford, that chemical therapy is the most appropriate method of treatment for Richard Z. Whether by design, as being engaged in a concerted effort to frustrate the statutory dictates of the Mental Hygiene Law article 10 statute, or coincidental and uncalculated, the effects are the same. The Office of Mental Health’s continued actions in this case have rendered the statutory dictates of the Mental Hygiene Law article 10 statute both ineffective and unenforceable. The Office of Mental Health’s failure to provide chemical therapy to Richard Z. continues their failure to provide meaningful treatment, resulting in the inability of Richard Z. to be safely released into the community under SIST. Here, Richard Z., who has been in the care and custody of the Office of Mental Health for over nine years, receives a new doctor, Dr. Gray, four days prior to an “informed consent” conference to allow Richard Z. to be placed on medication which would provide him with release to the community based on SIST. Dr. Gray, who has no prior relationship with the patient, Richard Z., has a 30 minute session and inserts her belief that even though Richard Z. has sought this treatment, understood all the consequences and effects of taking Lupron, and makes an “informed consent,” believes in her opinion that Richard Z. has an improper motivation to take this medication to get out of confinement, and refuses to prescribe the needed treatment. Compounding her deficiencies concerning sex offender treatment and her lack of familiarity with Richard Z., she failed to afford this patient the opportunity to receive a second opinion on this treatment from inside or outside of the CNYPC. In the opinion of this court, Dr. Gray, who has substituted her subjec *1079 tive opinion for Richard Z.’s “informed consent,” is both inexperienced in the field of treating sexual offenders and has not kept current with medical advancements and evolving scientific understanding as directed by Mental Hygiene Law, article 10, § 10.01.
Mental Hygiene Law, article 10, § 10.01 (c) provides that “[t]he goal of a comprehensive system should be to protect the public, reduce recidivism, and ensure offenders have access to proper treatment.” Richard Z. now cannot receive the Lupron treatment, which he has requested to reduce his sexual urges, and this court cannot release him into the community without that treatment. It would not be appropriate to release Richard Z. because of the safety factors involving the community outside of the CNYPC, Richard Z.’s past criminal history involving recidivism, and based upon the testimony and records this court has heard and received from the experts. This court originally found that “meaningful treatment” was not being provided to Richard Z., and shortly thereafter, substantial changes occurred at the Office of Mental Health for the psychiatric care and treatment of sex offenders, including new methods to allow sex offenders to advance in the program. To the disappointment of this court, however, the most advanced treatments and medications, which any patient should be entitled to under the care and custody of the State of New York, are being denied to Richard Z., thereby precluding him from attaining his liberty.
Conclusions
This court concludes that Richard Z. is not and has not been receiving meaningful treatment, as mandated by Mental Hygiene Law article 10, while he has been confined at CNYPC; and this court further concludes that Dr. Elisabeth Gray is not familiar with the evolving scientific understanding, flexible enough and sufficient to provide for the treatment of civilly confined sex offenders as required by Mental Hygiene Law article 10; and this court further concludes that CNYPC did not conduct the proper PPG tests as a lead up and process for the administration of a regimen of chemical therapy in contradiction of the guidelines set forth for such procedures by CNYPC and with no regard for drugs (trazodone) being given in the course of the tests; and this court further concludes that a regimen of chemical therapy offered the best course of medical treatment for Richard Z.; and this court further concludes that Richard Z. could be safely prescribed Lupron without an *1080 unmanageable effect on his bone density or any other side effects from the use of subject drug; and this court further concludes that Richard Z. has continuously expressed his “informed consent” for treatment with Depot Lupron and alen-dronate while confined at CNYPC; and this court further concludes that Dr. Gray has improperly substituted her subjective opinion that Richard Z.’s “motivation,” for being released after 39 years of confinement, is an improper basis for “informed consent” that Richard Z. has already executed and articulated on numerous occasions; and this court further concludes that Richard Z. was not afforded a second opinion regarding his right to choose to be treated with the drug Depot Lupron while confined at CNYPC in contradiction of the American Medical Association Code of Medical Ethics, Opinions on Practice Matters 2.1.1; and this court further concludes that Dr. Gray is not an “expert” with sufficient knowledge and experience to be treating sex offenders at the CNYPC, as she has demonstrated insufficient experience and knowledge with the use of a chemical regimen of drugs commonly used for suppressing aggressive sexual behavior (i.e., Lupron); and this court further concludes whether by design or as a result of incompetency, the result is the same, the clear meaning and the intent of Mental Hygiene Law, article 10, § 10.01 has not been afforded to Richard Z. Pursuant to Mental Hygiene Law, article 10, § 10.01 (a), (c), “[t]he goal of a comprehensive system should be to protect the public, reduce recidivism, and ensure offenders have access to proper treatment” including “an integrated approach that is based on evolving scientific understanding, flexible enough . . . and sufficient to provide meaningful treatment”; and this court further concludes that without chemical therapy, Richard Z. cannot be safely released into the community on SIST as mandated by Mental Hygiene Law article 10.
Therefore, it is hereby ordered that Richard Z. shall continue to be committed to the Central New York Psychiatric Center under the care of the New York State Commissioner of Mental Health as the term is defined in Mental Hygiene Law article 10, until further order of a court of competent jurisdiction; and it is further ordered that respondent receive care and treatment pursuant to Mental Hygiene Law article 10; and it is further ordered that respondent shall be provided, at least annually from the date of this order with written notice of his right to petition the court for discharge or waive pursuant to Mental *1081 Hygiene Law § 10.09; and it is further ordered that respondent shall retain any and all other rights provided by Mental Hygiene Law article 10, including the right to petition the court in the future for discharge or release under strict and intensive supervision and treatment; and it is further ordered that the court record of this proceeding shall be sealed by the Oneida County Clerk’s Office, and will only be available to the parties of this proceeding or upon further order of this court.

. See Florence Thibaut et al., The World Federation of Societies of Biological Psychiatry (WFSBP) Guidelines for Biological Treatment of Paraphilias, 11 World J of Biological Psychiatry 604, 604-644 (2010).

. Dr. Bradford is professor of psychiatry and acting clinical director of the Forensic Treatment Unit South East, professor of psychiatry, Faculty of Medicine, University of Ottawa. He has a cross appointment as professor in the Department of Criminology, University of Ottawa. He is also a professor in the Department of Psychiatry, Queen’s University, adjunct professor of psychiatry at the University of Saskatchewan and adjunct professor of psychiatry, University of Alberta. Dr. Bradford’s 99 page curriculum vitae is available upon request.